■ In the Matter of KATHERINE PATRICK et al., Respondents, v CESAR A. PERALES, as Commissioner of the New York State Department of Social Services, et al., Appellants. — Order entered March 8, 1984 in Supreme Court, New York County (Alfred A. Ascione, J.), denying motions to dismiss this proceeding as time barred, is modified, on the law and the facts, in the exercise of discretion, insofar as respondents' time in which to answer is extended to 20 days from the entry of this court's order, and the order appealed from is otherwise affirmed, without costs.

The State and city requested 20 days to answer the petition, rather than the 10 allowed under CPLR 3211 (f). Special Term, without stating its reasons, directed respondents to serve their answer within five days. This was an abuse of discretion and we modify accordingly. The request for 20 days was reasonable, nonprejudicial to petitioners, and should be granted. Concur — Carro, J. P., Bloom and Kassal, JJ.

Asch, J., dissents in a memorandum as follows: Petitioners' adopted child, Alicia, was born on September 29, 1970. On December 2, 1971, Alicia was placed in foster care with the New York City Department of Social Services (City DSS), which in turn placed her with Brookwood Child Care.

The Patricks were approved as prospective adoptive parents in May 1974. On July 8, 1974, Alicia was placed in their home as a foster child. In the spring of 1975, the parental rights of Alicia's natural mother were terminated on the basis of abandonment.

On April 25, 1975, Brookwood applied to City DSS for approval of an adoptive subsidy under Social Services Law § 398 (6) (former k) for the Patricks, based on financial need. That former paragraph of the Social Services Law provides as follows:

"§ 398. Additional powers and duties of commissioners of public welfare and certain city public welfare officers in relation to children

"Commissioners of public welfare and city public welfare officers responsible under the provisions of a special or local law for the children hereinafter specified shall have powers and perform duties as follows * * *

"(6) As to all foregoing classes of children * * *

"(k) In accordance with regulations of the department, make such payments for the care and support of a child or minor who has been placed out for adoption or who has been adopted, as in his judgment are necessary for the welfare of such child or minor. With respect to a child with such special, unusual or significant physical or emotional handicaps as, in his judgment, to be an obstacle to adoption he may enter into a contract with the adoptive parents subject to the approval of the department for a fixed period of time until the child attains the age of twenty-one years, or make payments without contract to adoptive parents for expenses including medical, surgical, psychiatric and other special costs, services and devices without regard to the financial ability of the adoptive parents and not subject to review on the basis of said financial ability.

"With respect to a child who has been adopted within this state but who has been removed from this state by his adoptive parents, or a child who has been adopted by residents of another state or of the commonwealth of Puerto Rico and who is, or who is likely to become, a public charge within this state, such payments may be made pursuant to an agreement between the district and the adoptive parents, provided that such agreement is in accordance with the regulations of the department promulgated to achieve the objective of increasing the number of adoptions of potential public charges, with particular emphasis upon children with the aforesaid handicaps that pose obstacles to adoption. Any such agreement shall become void at such time as it is determined by the district that a child on whose behalf

payments are being received pursuant to such agreement was brought into this state for the sole purpose of qualifying prospective out-of-state adoptive parents for such payments. Such local determination may be appealed to the department upon notice to the district within fifteen days of the mailing of the notification of such decision to the adoptive parents. The department shall conduct a fair hearing within thirty days after receipt of a notice of appeal and shall issue its final determination within thirty days after such hearing. The local determination shall remain in effect unless and until reversed by the department." On July 7, 1975, Brookwood submitted additional information requested by the City DSS to process the request for subsidy for petitioners.

On December 18, 1975, the City DSS rejected Brookwood's "Request for Authorization and Approval" and wrote, *inter alia,* that it would need other information to determine if the petitioners could become financially eligible.

The Patricks did not provide the requested information during the period between the December 18, 1975 decision and Alicia's adoption on September 1, 1976. Testimony at the fair hearing indicates that Brookwood and the Patricks determined shortly after the December 18, 1975 decision of City DSS that the Patricks could not qualify for a financial subsidy.

Subsequent to Alicia's adoption on September 1, 1976, the Laws of 1977 (ch 865), effective November 9, 1977, repealed Social Services Law § 398 (6) (k) and enacted Social Services Law title 9, "SUBSIDIES FOR THE ADOPTION OF CHILDREN" (§§ 450-458). Those statutory sections provided, as of 1977, *inter alia:*

"TITLE 9 — SUBSIDIES FOR THE ADOPTION OF CHILDREN

"§ 450. Statement of legislative intent

"The legislature intends, by the enactment of this title, to promote permanency of family status through adoption for children who might not otherwise derive the benefits of that status. By providing for an adoption subsidy program which will be applied uniformly on a statewide basis, the legislature also intends to eliminate, or at the very least substantially reduce, unnecessary and inappropriate long-term foster care situations which have proven financially burdensome to the state and, more importantly, inimical to the best interests of many children who have not been placed for adoption because of emotional or physical handicaps, age or other factors, in accordance with regulations of the department.

"§ 451. Definitions * * *

"2. 'Handicapped child' shall mean a child who possesses a specific physical, mental or emotional condition or disability of

such severity or kind which, in accordance with regulations of the department, would constitute a significant obstacle to the child's adoption * * *

"§ 453. Maintenance subsidy; handicapped child

"1. A social services official may make monthly payments for the care and maintenance of a handicapped child whom he has placed out for adoption or who has been adopted. Such payments shall be made without annual review until the child's twenty-first birthday to persons with whom the child has been placed, or to persons who have adopted the child and who applied for such payments prior to the adoption, pursuant to a written agreement therefor between such official and such persons. The social services official shall consider the financial status of such persons only for the purpose of determining the amount of the payments to be made, pursuant to subdivision three of this section * * *

"§ 454. Medical subsidy

"1. A social services official may make payments for the cost of care, services and supplies payable under the state's program of medical assistance for needy persons, provided to a handicapped child whom he has placed out for adoption or who has been adopted. Such payments shall not be restricted to care, services and supplies required for the treatment of the specific condition or disability for which a child was determined to be a handicapped child. Such payments also may be made with respect to a hard to place child who has been placed out for adoption with a person or persons who is or are sixty-two years old or over or who will be subject to mandatory retirement from his or their present employment within five years from the date of the adoption placement * * *

"4. An application for payment under this section shall be made prior to the child's adoption; provided, however, that an application may be made subsequent to a handicapped child's adoption if the adoptive parents first become aware of the child's physical or emotional condition or disability subsequent to the adoption and a physician certifies that the condition or disability existed prior to the child's adoption. An approval of an application for payments under this section shall not be subject to annual review by the social services official, and such approval shall remain in effect until the child's twenty-first birthday."

Chapter 865 (§ 4) provided that it "shall apply only to children who have been adopted or placed out for adoption *on or after*

*such date*" (emphasis added). *Matter of Crane* (99 Misc 2d 906, 908) interpreted "such date" to refer to the date of chapter 865's enactment, August 11, 1977, rather than to its effective date, November 9, 1977. For the purposes of this proceeding, however, that difference is immaterial.

On June 12, 1981, the Patricks' attorney sent Brookwood an application (signed June 9, 1981 by both the Patricks) for maintenance, medical and dental adoptive subsidies, retroactively from the date of adoption, i.e., September 1, 1976. The application was not granted and petitioners requested a fair hearing. At it, evidence was introduced that Alicia had minimal brain damage which caused learning problems. This damage had not been ascertained at the time of the adoption. Also, as noted, evidence was introduced which indicated that petitioners could not qualify for a subsidy in 1975.

On December 16, 1982, the hearing officer issued a decision after fair hearing on behalf of the State Department of Social Services (DSS) Commissioner holding, *inter alia,* that the Commissioner lacked jurisdiction to review the City DSS's failure to grant the 1975 and 1981 applications.

This petition was instituted on April 5, 1983, seeking the State DSS Commissioner's (1) annulment of the December 16, 1982 decision after fair hearing; (2) annulment of the City DSS December 18, 1975 determination; (3) a declaration that the refusal of City DSS and State DSS to receive new medical evidence and to rule substantively on the 1981 application for medical subsidy was wrongful; and (4) an order directing City DSS and State DSS to grant respondents adoptive maintenance and medical subsidies, retroactive to December 1, 1975. The State DSS and City DSS cross-moved to dismiss the petition as time barred and not stating a cause of action.

Special Term denied the cross motion, ruling that the petitioners' rights were governed by Social Services Law § 398 (6) (former k) and that the former law did not bar subsidies after an adoption was completed. It held the sole criterion of section 398 was the "welfare and best interests of the minor child."

With respect to State DSS' implementing regulations for Social Services Law § 398 (6) (former k), Special Term noted that 18 NYCRR former 450.7 likewise made the child's welfare and best interests the criterion for granting a subsidy. 18 NYCRR former 450.7 provided in pertinent part:

"450.7 Payments for care and support of certain adopted children and minors. [Additional statutory authority: Social Services Law, § 398 (6) (k)]

"(a) A social services official may make such payments for the care and support of a child or minor who has been placed out for adoption or who has been adopted as in his judgment are necessary for the welfare of the child or minor. Payments for medical, surgical, psychiatric and other special costs, services and devices for a specific illness, handicap or disability, as provided in this section, may not exceed the fees in the State fee schedule approved by the Director of the Budget * * *

"(d) Except as otherwise provided in this section, the social services official shall review annually the need of the adoptive parents for continued payments for care and support of the adopted child or minor and the amount thereof. At the time of this annual review and at any other time when indicated by changed circumstances, appropriate adjustments thereof shall be made based upon changes in the adoptive parents' gross income, resources and expenses in the care of the adopted child or minor, including medical expenses not otherwise covered or subject to payment or reimbursement by insurance, MA, or other sources * * *

"(g) An adoption subsidy agreement shall not be executed by a social services official after an adoption decree unless a request for a subsidy had been considered and approved by the official prior to the decree."

Special Term held that 18 NYCRR 450.7 (g) was invalid as inconsistent with Social Services Law § 398 (6) (former k) and subdivisions (a) and (d) of the same regulation and that petitioners' 1981 application was not therefore barred by the Statute of Limitations.

Special Term correctly held that Social Services Law § 398 (6) (former k) was the applicable statute. It erred, however, in reading that statute to authorize the approval of subsidies nearly five years after Alicia's adoption and almost four years after the statute was repealed. Special Term further erred in invalidating State DSS' former implementing regulation, 18 NYCRR 450.7 (g), which limited subsidies for the encouragement of the adoption of foster children to cases where the question of adoption remained open: that is, where the subsidy was approved before the adoption decree was entered.

Laws of 1977 (ch 865), which repealed Social Services Law § 398 (6) (k) and enacted its successor statute, title 9, §§ 450-458, explicitly limited the new statute governing subsidies to children placed or adopted *after its enactment*. Thus, since Alicia was both placed and adopted before the new statute's enactment, no subsidy could be granted her under it. When the Patricks

reapplied for a subsidy in 1981, they could only base their claim for eligibility on the old statute.

As of 1975, the former law authorized subsidy payments for a "child who has been placed out for adoption or who has been adopted". The time of application for such subsidy payments was to be determined "[i]n accordance with regulations of the department".

The statute was originally conceived as a means of allowing adoptions by lower-income foster adoptive parents in whose home such children had been boarded out. At the time Social Services Law § 398 (6) (former k) was enacted (L 1968, ch 320), it did not explicitly require that application for subsidy be made before adoption. However, Domestic Relations Law § 114 was also amended to require a court passing on adoption to give "due consideration to any assurance by a commissioner of public welfare that he will provide necessary support and maintenance for the foster child pursuant to the social welfare law."

Domestic Relations Law § 144, as amended, therefore contemplated the agreement's having been administratively approved *before* approval of adoption. Read in the light of the amended section 114, the original Social Services Law § 398 (6) (k) was clearly framed in expectation of an application for subsidy being made and approved prior to adoption.

When the Legislature recodified the adoptive subsidy program in 1977 by Laws of 1977 (ch 865), it made explicit the requirement for pre-adoption decree approval of a maintenance subsidy agreement based on financial need (Social Services Law § 453 [1]-[2]) and for pre-adoption decree approval of medical subsidy based on problems identified prior to the adoption (Social Services Law § 454 [4]).

Special Term's decision turned upon its identification of the child's "welfare and best interests" as the "sole criteri[on]" for the award of a subsidy. However, as noted, the purpose of the subsidy program was to encourage adoptions of children in foster care. Thus, incentives would be made available before adoption but would not be essential once adoption had been entered into.

When it became apparent that concern over unanticipated medical expenses for preexisting problems was also an obstacle to adoption, the Legislature amended the program to provide for postadoption subsidy agreements in such cases (*see,* Social Services Law § 454 [4]). This subsequent extension of eligibility for medical subsidies to applicants in petitioners' position, but whose cases arise under the new law, explicitly made as an

*expansion* of eligibility, is further evidence that the Legislature considered that the lack of eligibility for financial or special needs subsidy of *post*adoption applicants to have been consistent with the old law.

Special Term's invalidation of 18 NYCRR former 450.7 (g), the regulation incorporating the eligibility limitation, was thus incorrect. As pointed out, that regulation incorporating the preadoption eligibility limitation in regard to subsidy was consistent with the legislative purpose of encouraging adoption rather than subsidizing already-completed adoptions.

Under Social Services Law § 398 (6) (former k), had the Patricks provided information specified in the December 18, 1975 denial of their application prior to the actual adoption of Alicia, an agreement based on financial need could have been executed. However, after the adoption no such agreement could be executed. The application in 1981 was postadoption and could not be approved.

Since the applicable regulations required the application be approved prior to the decree, failure to approve the Patricks' application prior to the adoption decree was as much a denial as an explicit writing denying the application. Under Social Services Law § 398 (6) (former k), the Patricks had no right to an administrative appeal. Social Services Law § 398 (6) (former k), the applicable statute, gave adoptive subsidy applicants the right to appeal for a fair hearing *only* when it was contended that the adoptive child was brought into New York for the sole purpose of obtaining a subsidy.

Applying the canon of statutory construction that *expressio unius est esclusio alterius,* the inclusion of language specifically granting a right to a fair hearing in certain cases and not in others meant that an applicant for adoptive subsidy, denied for any reason other than the child's having been brought into New York, had no right to seek a State DSS administrative hearing (*see, Community Bd. No. 4 v Board of Estimate,* 88 AD2d 832, 833, *affd* 57 NY2d 846).

Thus, the Patricks had no right to a fair hearing pursuant to Social Services Law § 398 (6) (former k). As aforementioned, the Patricks only recourse was article 78 review of the determination (or lack of same) of City DSS. Since there was no basis for an order granting relief against State DSS, the petition should have been dismissed against it as a matter of law.

As to the City DSS determination, CPLR 217 allowed petitioners four months to seek relief. Their time ran out even before the September 1, 1976 adoption. Even if the December 18, 1975

decision is read as a nonfinal request for more information, the Patricks had until the decree date to supply such information. They then had four months after the decree date to challenge the failure of the City DSS to grant a subsidy.

The Patricks could not avoid the Statute of Limitations by reapplying in 1981. The right to maintain a proceeding was complete either on December 18, 1975 or September 1, 1976 (*see, Matter of Johnston v Curry,* 68 AD2d 991).

The petitioners' claims in both the 1975 and 1981 applications are similar and a second application for the same relief does not extend the time for review (*see, Matter of Qualey v Shang,* 70 AD2d 619, 621; *see also, Matter of Davis v Kingsbury,* 30 AD2d 944, 945, *affd* 27 NY2d 567). Further, the alleged continuing efforts to supply information after the adoption could not toll the statute (*see, Matter of Nelson v Kelly,* 4 AD2d 596, 598-599). Thus, the petition should also have been dismissed as time barred.